## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TONY DPHAX KING, | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **CIVIL ACTION** |
| v. | : | |
| | : | **NO. 16-6414** |
| POLICE AND FIRE FEDERAL CREDIT | : | |
| UNION, | : | |
| | : | |
| **Defendant.** | : | |

## MEMORANDUM

**Tucker, J.**                                                                       **May 22, 2019**

Before the Court is Defendant's Motion for Summary Judgment (ECF No. 23) and

Plaintiff's Reply in Opposition to Motion of Police and Fire Federal Credit Union for Summary

Judgment (ECF No. 26). Upon careful consideration of the foregoing, and as explained in detail

below, Defendant's Motion for Summary Judgment is GRANTED.

## I.       PROCEDURAL AND FACTUAL BACKGROUND

### A.       Plaintiff's First Application For Home Equity Loan

On November 9, 2015, Plaintiff met with an employee of Defendant Police and Fire

Federal Credit Union ("PFFCU") at a PFFCU branch location to apply for a home equity loan.

Compl. ¶¶ 7, 8, ECF No. 3. The PFFCU employee asked Plaintiff a series of questions to

complete Plaintiff's application. Plaintiff explained that he wanted the home equity loan for the

"[p]urchase of current residence at 1210 S. 50th St." and that his property at "1414 Grays Ferry

Ave." would serve as collateral. Compl. ¶ 23; *see also* Pl.'s Reply in Opp'n 3, ECF No. 26

(explaining that "[t]his case arises out of Plaintiff's application for a tiny Home Equity Loan

1

secured by his primary residence at 1414 Grays Ferry Avenue.").[1]  The 1210 S. 50th St. property ("50th Street property") that Plaintiff wished to buy with the proceeds from the home equity loan was, at the time, occupied by Plaintiff's grandmother, and was also used by Plaintiff as a mailing address.[2]  The PFFCU employee gathered additional information in connection with Plaintiff's application including, that Plaintiff's race is "Black or African-American," Plaintiff's sex is "Male," Plaintiff sought a "[f]ixed" rate type for his loan," Plaintiff sought a $13,000.00 loan for a "term of 20 years," Plaintiff's 1414 Grays Ferry Ave. property ("Grays Ferry Ave. property") was valued between "$73k to $75k," Plaintiff worked at "Delta-T Behavioral Health" and that Plaintiff's name was on the deed of the Grays Ferry Ave. property.  Compl. ¶ 23.  After gathering this information and inputting the data into PFFCU's computerized application system, the PFFCU employee told Plaintiff that he would receive a decision on his application for the loan within twenty-four hours.  Compl. ¶ 24.

---

[1] There existed, and continues to exist, significant confusion between the Parties over where Plaintiff resides or resided.  The Court has also been puzzled by Plaintiff's self-contradictory statements.  At times, Plaintiff has represented that "at all relevant times" his "current residence" was the 1210 S. 50th St. property, but at others, Plaintiff has represented that his "primary residence" was the 1414 Grays Ferry Ave. property.  As discussed in Section III.A, below, it is ultimately unnecessary for the Court to determine where Plaintiff resided in rendering this decision.

[2] Pl.'s Reply in Opp'n 3, ECF No. 26; *compare* Pl.'s Appl. Proceed IFP 7, ECF No. 1 (showing the 50th St. address to be Plaintiff's mailing address) *and* Pl.'s Reply in Opp'n 1, ECF No. 26 (stating that the 50th St. address is "Plaintiff's *mailing address*") *with* Pl.'s Reply in Opp'n 3 (stating that Plaintiff's "primary residence" is "1414 Grays Ferry Avenue") *and* Pl.'s Appl. Proceed IFP 3, ECF No. 1, *King v. T.D. Bank, N.A.*, Civ. A. No. 2:13-cv-01870-PD (stating that Plaintiff owned his home at "1414 Grays Ferry Ave.").

In his earlier case, *King v. T.D. Bank, N.A.*, Plaintiff sued T.D. Bank for alleged credit discrimination after T.D. Bank denied Plaintiff's application for a Home Equity Loan in August 2012.  Civ. A. No. 2:13-cv-01870-PD.  At that time, Plaintiff allegedly "had a credit score of 685 (or higher)."  Compl. ¶ 11, ECF No. 3, *King v. T.D. Bank, N.A.*, Civ. A. No. 2:13-cv-01870-PD.  Plaintiff settled his case against T.D. Bank in September 2013.  Dismissal Order, ECF No. 25, *King v. T.D. Bank, N.A.*, Civ. A. No. 2:13-cv-01870-PD.

**B.     Plaintiff's First Application Denied; Plaintiff's Second Application For A Home Equity Loan**

The next day, on November 10, 2015, the PFFCU employee called Plaintiff and notified him that his application for a home equity loan was denied.  Compl. ¶ 25, ECF No. 3.  During this phone call, Plaintiff asked PFFCU to consider him for another home equity loan of $10,000.00. Compl. ¶ 28.  Later that day, the PFFCU employee called Plaintiff to tell him that PFFCU underwriters had also denied Plaintiff's second application for a $10,000.00 home equity loan.  Compl. ¶ 29.

**C.     Adverse Action Notices**

In connection with PFFCU's decision to deny Plaintiff's two loan applications, PFFCU prepared and provided to Plaintiff two adverse action notices, which set forth PFFCU's principal reasons for denying the applications as well as other credit information and disclosures.

The first of the two adverse action notices ("Adverse Action Notice 1") was dated November 10, 2015, the day after Plaintiff's first application for a loan.  Compl. Ex. D-2, ECF No. 3.  Adverse Action Notice 1 inaccurately noted that Plaintiff sought a home equity loan to purchase a "manufactured home," when in fact, Plaintiff sought a home equity loan to purchase a "row home" property, a short distance from Plaintiff's Grays Ferry Ave property.  Compl. Ex. D-2, ECF No. 3.  The notice explained that PFFCU's principal reasons for denying Plaintiff's loan request was that Plaintiff had a "limited credit history," and the "[l]ength of [t]ime [a]ccounts [h]ave [b]een [e]stablished."  Compl. Ex. D-2.  PFFCU, the notice continued, based its decision, in part, "on information obtained in a report from the consumer reporting agency" known as Experian.  Compl. Ex. D-2.  Plaintiff's Experian credit score was "619" out of "950."  Compl. Ex. D-2.  Several "[k]ey factors [] adversely affected [Plaintiff's] credit score" including: the number of Plaintiff's established accounts, the time since delinquency was too recent or

otherwise unknown, the proportion of Plaintiff's balances to credit limits on revolving accounts was too high, the proportion of Plaintiff's balances to his credit limits on bank/national revolving accounts was too high, and Plaintiff had made too many credit inquires in the last year. Compl. Ex. D-2, ECF No. 3.

The second adverse action notice ("Adverse Action Notice 2") was dated November 11, 2015, the day after Plaintiff's telephone application for a $10,000.00 home equity loan. Adverse Action Notice 2, like Adverse Action Notice 1, inaccurately noted that Plaintiff sought a home equity loan to purchase a "manufactured home" when he was, instead, trying to buy a "row home." Compl. Ex. D-1; *see also* Compl. ¶ 57 (referring to the 50th Street property as a "Georgian, two-story row home"). Still, the notice explained that the reason PFFCU denied Plaintiff's application was because Plaintiff had "limited credit history," "we do not offer the type of credit [Plaintiff] requested," and the length of time that Plaintiff's accounts has been established. Compl. Ex. D-1. As with Adverse Action Notice 1, this notice explained that PFFCU based its decision, in part, "on information obtained in a report from" Experian. As it was the day before, Plaintiff's Experian credit score was "619" out of "950." Compl. Ex. D-1.

Having denied Plaintiff's application for a $13,000.00 and a $10,000.00 home equity loan on grounds unrelated to the value of Plaintiff's Grays Ferry Ave. property, PFFCU did not order an appraisal of the Grays Ferry Ave. property, which Plaintiff had offered as collateral. *See* Def.'s Mem. Supp. Mot. Summ. J. 2, ECF No. 23-1 (citing Answer ¶ 60, ECF No. 5; Greco Decl. ¶ 15, ECF No. 23-2).

### D. Procedural Background: Plaintiff Files Federal Lawsuit Two Weeks After PFFCU Denies Plaintiff's Applications

Within two weeks of PFFCU's denial of Plaintiff's applications for home equity loans, Plaintiff filed an application to proceed *in forma pauperis* to pursue a lawsuit against PFFCU

alleging various violations of the Equal Credit Opportunity Act ("ECOA"), the Fair Housing Act ("FHA"), and the Dodd-Frank Act. *See* Pl.'s Appl. Proceed IFP, *King v. Police and Fire Fed. Credit Union*, Civ. A. No. 2:15-cv-6288-CMR, ECF No. 1. Plaintiff's first application to proceed *in forma pauperis* was denied by the Honorable Cynthia M. Rufe. *See* Order, *King v. Police and Fire Fed. Credit Union*, Civ. A. No. 2:15-cv-6288-CMR, ECF No. 2.

A month later, Plaintiff filed a new application to proceed *in forma pauperis*, which this Court granted. *See* Pl.'s Appl. Proceed IFP, ECF No. 1; Order, ECF No. 2. Plaintiff's Complaint sets forth fourteen counts and five forms of requested relief. Counts I through XII allege violations of the ECOA; Count XIII alleges a violation of the FHA; and Count XIV alleges a violation of the Dodd-Frank Act. Compl. 10–15, ECF No. 3.

Plaintiff's claims in Counts I through XII, under the ECOA, are grounded in allegations of general violations of the ECOA including credit discrimination and racial discrimination.[3]

Plaintiff's claim in count XIII, under the FHA, is based on a theory that PFCCU discriminated against him because of his "disability." Compl. ¶ 62. Plaintiff contends that he has a "finger impairment," but more specifically, "a disabled left pinky finger." Compl. ¶ 35. Although his "finger impairment did not result in a substantial impediment to employment," Plaintiff contends that his finger impairment qualifies him as a disabled person under the Americans with Disabilities Act because he was perceived to be disabled. Compl. ¶ 62.[4]

---

[3] Among the various allegations made under the ECOA, Plaintiff claimed that PFFCU's actions violated "12 C.F.R. 202.6(b)(3)." Compl. ¶ 52. 12 C.F.R. 202.6(b)(3), now codified at 12 C.F.R. § 1002.6(b)(3) relates to discrimination based on "[c]hildbearing, childrearing." Plaintiff has not adduced any evidence that Plaintiff's childbearing or childrearing had any influence on PFFCU's decision to deny his applications. Count III is, therefore, specifically dismissed. The remaining counts of Plaintiff's Complaint are also dismissed as explained in Section III, below.
[4] He asserts, without evidence, that he was perceived to be disabled due to his disabled left pinky finger under 42 U.S.C. § 12102 (defining disability as "a physical or mental impairment

Plaintiff's claim in count XIV, under the Dodd-Frank Act, is based on PFFCU's alleged failure to comply with the "Mortgage Reform" provisions of the Dodd-Frank Act.  Compl. ¶¶ 63–64, ECF No. 3.

The Complaint concludes with four relevant requests for relief: (1) $13,000.00—the amount of credit that "plaintiff originally sought . . . on Monday, November 9, 2015 (actual damages)"; (2) $10,000.00 in punitive damages under 12 CFR § 202.16;[5] (3) injunctive relief in the form of an order directing PFFCU to disclose its criteria for evaluating creditworthiness for loan applicants like Plaintiff; and (4) $1,000.00 for a retainer to be paid to an unidentified attorney.  Compl. 16–17.

After PFFCU answered Plaintiff's Complaint, the Court held a Federal Rule of Civil Procedure 16 conference and then issued a scheduling order setting a discovery deadline of August 30, 2017.  Thereafter, the Parties were directed to proceed to a mandatory settlement conference before Chief Magistrate Judge Linda K. Caracappa.  Scheduling Order, ECF No. 9. Settlement discussions proved fruitless and PFFCU filed the present Motion for Summary Judgment.

Plaintiff failed to file a response to the Motion for Summary Judgment until after the Court notified Plaintiff that failure to file a response might result in dismissal of this case.  Order, ECF No. 25.  Nearly two months after PFFCU filed its Motion for Summary Judgment, on

---

that substantially limits one or more major life activities . . . or being regarded as having such an impairment (as described in paragraph (3))."

[5] In referring to regulations promulgated under the ECOA, Plaintiff sometimes cites to 12 C.F.R. part 202, but the Consumer Financial Protection Bureau ("CFPB") has updated the citations from 12 C.F.R. part 202 to aid in readability.  The regulations under 12 C.F.R. part 202 are now located at 12 C.F.R. part 1002.  Thus, all further references to regulations under the ECOA will be to the new 12 C.F.R. part 1002 citations.

October 22, 2018, Plaintiff filed a response in opposition to PFFCU's Motion for Summary

Judgment.  Pl.'s Reply in Opp'n, ECF No. 29.

## II.    STANDARD OF REVIEW

Under Rule 56 of the Federal Rules of Civil Procedure, a court shall grant summary

judgment in favor of the moving party only "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56.  A fact is "material" if it is "one that might 'affect the outcome of the suit under governing

law.'"  *Smith v. Johnson & Johnson*, 593 F.3d 280, 284 (3d Cir. 2010) (quoting *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A dispute as to a material fact is "genuine" if it

"is one that 'may reasonably be resolved in favor of either party.'"  *Lomando v. United States*,

667 F.3d 363, 371 (3d Cir. 2011) (quoting *Anderson*, 477 U.S. at 250).  When assessing a motion

for summary judgment, the court "must construe all evidence in the light most favorable to the

nonmoving party." *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015).

## III.    DISCUSSION

### A.    ECOA Claims

The Court concludes that there exists no genuine issue of material fact in this case and

that construing all evidence in a light most favorable to Plaintiff, PFFCU is still entitled to

judgment as a matter of law on Plaintiff's ECOA counts because Plaintiff cannot establish the

prima facie case for racial discrimination under the ECOA and because Plaintiff's general credit

discrimination claim based on various purported violations of the ECOA regulations are based

on misinterpretations of those regulations.  As Plaintiff places great significance on the perceived

unlawfulness of PFFCU's two Adverse Action Notices and PFFCU's perceived unlawful failure

to conduct an appraisal of Plaintiff's Grays Ferry Ave. property, the Court will first address these

allegations and explain why they are unavailing before turning to Plaintiff's racial discrimination claim.

        i.        **Plaintiff's Arguments That The Adverse Action Notices Violated The ECOA**

Plaintiff alleges that in issuing its two Adverse Action Notices, PFFCU "violated Regulation B in 4 ways: (1) Non-specific reasons were given on the adverse action notices, (2) The 11/11/2015 adverse action notice states an UNTRUTH about the 'TYPE' of loans that PFFCU offers, (3) The address of PFFCU is missing from the adverse action notices and (4) PFFCU processed the loan for a 'manufactured home' which was not the applicant's purpose for the loan." Pl.'s Reply in Opp'n 10–11, ECF No. 26. The Court addresses each of these purported violations below.

        1.        **PFFCU's Specific Reasons For Denying Plaintiff's Credit Applications Were Legally Sufficient**

Under ECOA regulations "[a] notification given to an applicant when adverse action is taken shall be in writing and shall contain a statement of specific reasons for the action taken." 12 C.F.R. § 1002.9(a)(2)(i). The CFPB's official interpretation of this requirement explains that "[a] creditor must disclose the <u>principal reasons</u> for denying an application or taking other adverse action. The regulation <u>does not mandate that a specific number of reasons be disclosed,</u> but <u>disclosure of more than four reasons is not likely to be helpful</u> to the applicant." Official Interpretations of Reg. B, 12 C.F.R. pt. 1002, supp. I, § 1002.9(b)-1 (emphasis added). Further, the CFPB has clarified that "[a] creditor need not describe how or why a factor adversely affected an applicant. For example, the notice may simply say 'length of residence' rather than 'too short a period of residence.'" Official Interpretations of Reg. B, 12 C.F.R. pt. 1002, supp. I, § 1002.9(b)-3. That the regulations allow for flexibility in this regard comports with the purpose

of the notice requirement.  The notice requirement exists so that "[i]n those cases where the creditor may have acted on misinformation or inadequate information, the statement of reasons gives the applicant a chance to rectify the mistake."  *Treadway v. Gateway Chevrolet Oldsmobile, Inc.*, 362 F.3d 971, 977 (7th Cir. 2004) (citing *Fischl v. Gen. Motors Acceptance Corp.*, 708 F.2d 143, 146 (5th Cir. 1983)).

In evaluating whether a creditor's reasons are specific enough under ECOA regulations, courts consider whether the language used by the creditor tracks language that has been approved by the CFPB.  *See, e.g.*, *Wigod v. PNC Bank, N.A.*, 338 F. Supp. 3d 758, 766 (N.D. Ill. 2018) (comparing notification forms provided by CFPB as exemplars with the form that the plaintiff contended was "vague" and in violation of the specificity requirement under the ECOA regulations and concluding that the "vague" reasons sufficed).  The CFPB provides several form notices of adverse action for use by creditors, which the CFPB considers compliant with ECOA regulations.  These form notices are publicly available in Appendix C to 12 C.F.R. part 1002.  For example, under Sample Form C-1, Part I, a creditor may permissibly explain that its "Principal Reason(s) for Credit Denial, termination, or Other Action Taken Concerning Credit" is due to the applicant's "Limited credit experience."  12 C.F.R. 1002, app. C.  Similarly, Sample Form C-2 permits a creditor to use the explanation "insufficient credit experience."  12 C.F.R. 1002, app. C.  In short, where a creditor's reasons for denying a credit application hew closely to the reasons that have been approved by the CFPB, courts will generally conclude that such reasons are specific enough under 12 C.F.R. § 1002.9(a)(2)(i).

In this case, Adverse Action Notice 1 explained that PFFCU denied Plaintiff's application for a home equity loan because Plaintiff had a "limited credit history," and the "[l]ength of [t]ime [a]ccounts [h]ave [b]een [e]stablished."  Compl. Ex. D-2, ECF No. 3.

Adverse Action Notice 2 explained that PFFCU denied Plaintiff's application for a home equity loan because Plaintiff had "limited credit history," "we do not offer the type of credit [Plaintiff] requested," and the length of time that Plaintiff's accounts has been established. Compl. Ex. D-1. Setting aside, for the moment, the alleged inaccuracy of PFFCU's statement that "we do not offer the type of credit requested," the Court finds that each of the reasons offered in the Adverse Action Notices meets the specificity requirement under 12 C.F.R. § 1002.9(a)(2)(i).

PFFCU provided its reasons to Plaintiff "in writing." 12 C.F.R. § 1002.9(a)(2)(i). PFFCU complied with the CFPB's guidance that "disclosure of more than four reasons is not likely to be helpful" having offered two "principal reasons" for denying Plaintiff's application in Adverse Action Notice 1 and three "principal reasons" for denying Plaintiff's application in Adverse Action Notice 2. Official Interpretations of Reg. B, 12 C.F.R. pt. 1002, supp. I, § 1002.9(b)-1. PFFCU tracked the approved language in CFPB's Sample Form C-1 when it explained that PFFCU was denying Plaintiff's credit application due to a "limited credit history." *Compare* Compl. Ex. D-2 (listing one of PFFCU's principal reasons for denial as "limited credit history") *with* Sample Form C-1, 12 C.F.R. part 1002, app. C. (listing "[l]imited credit experience" as an acceptable reason for denial).

While these reasons may not provide the level of exacting detail that Plaintiff would prefer, these reasons sufficed to effectuate the general purpose of the notice requirement—to permit Plaintiff a "chance to rectify [any] mistake" PFFCU may have made in processing his application. *Treadway*, 362 F.3d at 977. Thus, the Court concludes that PFFCU's written statement of its principal reasons for denying Plaintiff's application was legally sufficient to comply with 12 C.F.R. § 1002.9(a)(2)(i).

### 2. Plaintiff's Allegation Relating To PFFCU's "Type Of Credit" Explanation

Next, Plaintiff argues that PFFCU violated the ECOA when it explained that one of its reasons for denying Plaintiff's application was because "they do not offer the 'type' of loan that applicant applied for." Pl.'s Reply in Opp'n 13, ECF No. 26. Plaintiff contends that this reason violated the ECOA because it was "UNTRUE." Pl.'s Reply in Opp'n 13. While the Court is unpersuaded that there exists a genuine issue as to the veracity of PFFCU's reason, the Court need not make a specific conclusion about the accuracy of the statement to reject Plaintiff's argument. This is because even if the Court were to conclude that PFFCU's statement was inaccurate, a conclusion which is unsupported by Plaintiff's own evidence, the inaccuracy does not amount to a violation of ECOA regulations because it constitutes an "inadvertent error" made in the course of a good faith attempt to comply with the ECOA.

Under CFPB regulations, "[a] creditor's failure to comply with §§ 1002.6(b)(6), 1002.9, 1002.12 or 1002.13 is not a violation if it results from an <u>inadvertent error</u>." 12 C.F.R. § 1002.16(c) (emphasis added). "Inadvertent errors include, <u>but are not limited to</u>, clerical mistake, calculation error, computer malfunction, and printing error." Official Interpretations of Reg. B, 12 C.F.R. pt. 1002, supp. I, § 1002.16 (emphasis added). That the CFPB included a carveout for "inadvertent errors" in their regulations is not surprising in view of the ECOA's own "good faith compliance" safe harbor provision. 15 U.S.C. § 1691e(e); *see also Wigod*, 338 F. Supp. 3d at 766 (describing § 1691e(e) as a "safe harbor"). The ECOA itself provides that "[n]o provision of this subchapter imposing liability shall apply to any act done or omitted in good faith in conformity with any official rule, regulation, or interpretation thereof by the Bureau." 15 U.S.C. § 1691e(e).

To resolve Plaintiff's argument, the Court begins with what the uncontroverted evidence shows: PFFCU offers (1) regular home equity loans and (2) non-owner occupied home equity loans, also referred to as a "home equity loan on an investment property." Greco Decl. ¶ 13, ECF No. 23-2; *see also Home Equity Loans: Make Your Dreams a Reality*, PFFCU, https://www.pffcu.org/real-estate-loans/home-equity-loans/ (last visited May 17, 2019) (cited by Plaintiff in his Reply Brief at Exhibit 13 and showing that PFFCU offers two forms of home equity loans). For regular home equity loans, PFFCU offers credit for a term of up to twenty years. *Id.* For home equity loans on an investment property—a property in which the applicant does not reside—PFFCU offers credit for a term of up to fifteen years. *Id.*

It was accurate, therefore, for PFFCU to state that it does not offer credit for non-owner occupied home equity loans on investment properties for twenty years. The only issue presented, therefore, is whether Plaintiff applied for a regular home equity loan, which is offered for a term of twenty years, or a home equity loan on an investment property, which is not offered for a term of twenty years. This issue may be resolved by reviewing the circumstances of Plaintiff's applications.

By Plaintiff's own admission, he told PFFCU that he sought a home equity loan for a term of "20 years" to "[p]urchase [] current residence at 1210 S. 50th Street," which "at all relevant times . . . [was his] principal place of residence," secured by a property he owned located at 1414 Grays Ferry Ave. Complaint ¶¶ 4, 23, ECF No. 3; *see also* Greco Decl. ¶¶ 2–3, ECF No. 23-2 (stating that PFFCU understood Plaintiff's primary residence to be the 50th Street property, and that Plaintiff and his mother co-owned the Grays Ferry Ave. property). Plaintiff's allegations in his verified Complaint, thus, support PFFCU's statement that it believed Plaintiff to have been applying for a home equity loan on an investment property—one in which the

property offered as collateral is not occupied by the applicant—for a term of twenty years. As PFFCU does not offer such home equity loans on investment properties, the statement in Adverse Action 2 that "we do not offer the type of credit you requested," was accurate.

To undermine the facial accuracy of PFFCU's statement, Plaintiff now contends, contrary to the verified allegations in his Complaint that he "lives at 1414 Grays Ferry Avenue" and, therefore, he was not seeking a twenty-year home equity loan on an investment property, but instead, a twenty-year regular home equity loan. Pl.'s Reply in Opp'n 1, ECF No. 26. To support this proposition, Plaintiff submits an electric utility bill for the Grays Ferry Ave. property that was addressed to Plaintiff and dated nearly three years after the incidents at issue in this case. Pl.'s Reply in Opp'n Ex. 2.

Not only is this bill irrelevant to the period at issue in this case, but the bill undermines Plaintiff's argument that PFFCU's statement that "we do not offer the type of credit you requested" constitutes a violation of the ECOA. This is because the confusion over whether Plaintiff resided at the Grays Ferry Ave. property or the 50th St. property supports the finding that PFFCU reasonably misunderstood that Plaintiff's Grays Ferry Ave. property was a non-owner-occupied investment property for which PFFCU would not offer a twenty-year term. As Plaintiff made clear in his verified Complaint, he was asked his "Reason" for the home equity loan, and he responded "Purchase of current residence at 1210 S. 50th St."; *see also* Greco Decl. ¶¶ 2–3, ECF No. 23-2 (corroborating that PFFCU understood from its interview with Plaintiff that "Mr. King did not live in the Grays Ferry Avenue Property" and, therefore, "the loan was considered a home equity loan on an investment property").

That PFFCU's misunderstanding about the status of the Grays Ferry Ave. property was reasonable is supported by the confusion over this very issue in the litigation of this case. This

confusion has persisted largely due to Plaintiff's contradictory statements about whether his Grays Ferry Ave. or 50th Street property was his residence. *See* Compl. Ex. D-2, ECF No. 3 (supporting that PFFCU believed that 50th Street property was Plaintiff's residence because the Adverse Action Notices were delivered to that address); Pl.'s Reply in Opp'n 1–2, ECF No. 26 (stating that the 50th Street address "served as Plaintiff's *mailing address*."); Greco Decl. ¶ 3, ECF No. 23-2 (showing that based on the information from Plaintiff's application that Plaintiff resided at the 50th Street property); *compare* Compl. ¶ 4 (stating that "Plaintiff <u>at all relevant times</u>, is a law-abiding citizen of these United States with a <u>principal place of residence</u> at <u>1210 S. 50th Street</u>") *with* Pl.'s Reply in Opp'n 3 (stating that Plaintiff's "primary residence [is] at 1414 Grays Ferry Avenue.").

Ultimately, what is important here is not whether Plaintiff, in fact, lives or lived at one address or the other, but that the evidence shows that PFFCU's understanding—whether ultimately a misunderstanding—was reasonable under the circumstances and, therefore, any error PFFCU may have made when it stated that "we do not offer the credit you requested," was inadvertent and based on a good faith attempt to comply with the ECOA in processing Plaintiff's applications.[6]

---

[6] The Court notes that under the circumstances in this case, upon receiving the Adverse Action Notice, Plaintiff could, though he did not, have immediately contacted PFFCU to correct PFFCU's apparent misunderstanding about the status of Plaintiff's primary residence. Indeed, such a course of action would have been fully consistent with the purpose of the ECOA's adverse action notice provision. *See Treadway*, 362 F.3d at 977.

### 3. That The Adverse Action Notices Did Not Contain PFFCU's Address Was Not Prejudicial And Constitutes An Inadvertent Error

Plaintiff rightly notes that the Adverse Action Notices do not, on their face, contain PFFCU's address.[7] This omission, however, is an inadvertent error and evident from the fact that the Adverse Action Notices themselves refer to "the credit union's address that is shown at the top of this notice." Compl. Ex. D-2, ECF No. 3. The notices, on their face, exhibit an intent on PFFCU's part to include the address at the top of the form. PFFCU should, of course, rectify this error immediately and ensure that its address is printed on its form notices.

Importantly in this case, the inadvertent omission of the address produced no prejudice to Plaintiff. Plaintiff was familiar with PFFCU and the various ways of contacting it. He had been a member of PFFCU for "5 or more years" at the time of his loan applications. Compl. ¶ 6, ECF No. 3. He had personally visited the PFFCU branch location at "901 Arch Street, Philadelphia, PA 19107" to apply for his first home equity loan. Compl. ¶ 10. He received personal phone calls from PFFCU employees who were working on his applications. Compl. ¶¶ 25, 28, 29, and 31. He has visited the PFFCU website on various occasions. *See* Compl. Ex. C (attaching screenshots of the PFFCU website). In short, Plaintiff suffered no prejudice and no damage from PFFCU's omission of its address on the Adverse Action Notices.

### 4. PFFCU Inaccurately Coded Plaintiff's Application As One For "Home Equity Loan – Manufactured Home Purchase"

Plaintiff also rightly notes, and PFFCU concedes, that PFFCU inaccurately coded the "Requested Credit" in the Adverse Action Notices as a request for "Home Equity Loan – Manufactured Home Purchase." Pl.'s Reply in Opp'n 11, ECF No. 26; *see also* Def.'s Mem.

---

[7] Under 12 C.F.R. § 1002.9(a)(2), an adverse action notice should include, among other things, the "name and address of the creditor." 12 C.F.R. § 1002.9(a)(2).

Supp. Mot. Summ. J. 6 n.2, ECF No. 23-1 (admitting that PFFCU inaccurately coded Plaintiff's application in both Adverse Action Notices). Here, the inaccurate coding of Plaintiff's credit application for purposes of the Adverse Action Notices was inadvertent, and in any event, was immaterial to the reasons for PFFCU's denial of Plaintiff's application. *See* Compl. Exs. D-1 and D-2, ECF No. 3 (showing that the reasons for PFFCU's denial of Plaintiff's application were unrelated to the coding error).

Clerical errors such as this fall squarely within the inadvertent error exception under ECOA regulations. *See* Official Interpretations of Reg. B, 12 C.F.R. pt. 1002, supp. I, § 1002.16(c) (providing that "[i]nadvertent errors include, but are not limited to, clerical mistake, calculation error, computer malfunction, and printing error."); *see also Harbaugh v. Cont'l Ill. Nat'l Bank & Tr. Co.*, 615 F.2d 1169, 1174 (7th Cir. 1980) (acknowledging that a computer programming error may be excusable under the good faith safe harbor provision of the ECOA).

### ii. Applicants For Credit Are Not Entitled To An Appraisal As A Matter Of Course

Plaintiff next argues that PFFCU violated the ECOA when it failed to develop an appraisal report of the Grays Ferry Ave. property and failed to provide a notice of such appraisal and a copy of any appraisal report to Plaintiff. Pl.'s Reply in Opp'n 11, 14–15, ECF No. 26. Plaintiff's argument is based on a misunderstanding of the ECOA and its regulations relating to appraisals. The ECOA does not require that an appraisal be performed on every property offered as collateral for a loan. Rather, what the ECOA requires is for a creditor to provide a notice that to the extent an appraisal is, in fact, performed, then the applicant has a right to receive a copy of any written report generated by the appraisal.

12 C.F.R. § 1002.14 provides:

Disclosure. For applications subject to paragraph (a)(1) of this section, <u>a creditor shall mail or deliver to an applicant</u>, not later than the third business day after the creditor receives an application for credit that is to be secured by a first lien on a dwelling, <u>a notice</u> in writing <u>of the applicant's right to receive a copy of all written appraisals developed in connection with the application</u>. In the case of an application for credit that is not to be secured by a first lien on a dwelling at the time of application, if the creditor later determines the credit will be secured by a first lien on a dwelling, the creditor shall mail or deliver the same notice in writing not later than the third business day after the creditor determines that the loan is to be secured by a first lien on a dwelling.

12 C.F.R. § 1002.14(a)(2) (emphasis added). Section 1002.14, thus, entitles an applicant to "a notice" of the applicant's "right" to "a copy of all written appraisals" if one is "developed in connection with the application." *Id.*

In this case, PFFCU denied Plaintiff's loan applications for reasons unrelated to the value of the Grays Ferry Ave. property. It is uncontested that no appraisal of the Grays Ferry Ave. property was "developed in connection with the application," thus, there was no written appraisal to provide to Plaintiff. While PFFCU erred in not providing a notice of Plaintiff's right to receive a copy of a written appraisal report, if one had been generated, does constitute a procedural violation of 12 C.F.R. § 1002.14(a)(2), Plaintiff has produced no evidence of any prejudice or damage resulting from this error.

### iii.   Plaintiff's Other Discrete Allegations Of Violations Of The ECOA

Plaintiff also asserts that "[i]f PFFCU complied with 'all' federal laws including 12 CFR §1002.4(c) and 12 C.F.R. §1002.13(a) regarding written applications this would not be a controversy." Pl.'s Reply Opp'n 13, ECF No. 26. This assertion, again, misapprehends the requirements of the ECOA.

Under 12 C.F.R. § 1002.4(c), "[a] creditor shall take written applications for the dwelling-related types of credit covered by § 1002.13(a)." 12 C.F.R. § 1002.4(c). The CFPB's

official interpretation of § 1002.4(c) clarifies that "use of a printed form is <u>not required</u>." Official Interpretations of Reg. B, 12 C.F.R. pt. 1002, supp. I, § 1002.4(c) (emphasis added). Rather, "[i]nformation entered directly into and retained by a computerized system qualifies as a written application under this paragraph." Official Interpretations of Reg. B, 12 C.F.R. pt. 1002, supp. I, § 1002.4(c)-3.

In this case, Plaintiff admits that PFFCU "entered all plaintiff's answers into his desk top computer at 901 Arch Street, Philadelphia, PA 19107." Compl. ¶ 10, ECF No. 3. PFFCU produced to Plaintiff PFFCU's electronic documents memorializing the application. Pl.'s Reply in Opp'n Ex. 9, ECF No. 26 (showing that the information was inputted on the day that Plaintiff asserts he applied for his home equity loan). PFFCU, thus, complied with 12 C.F.R. § 1002.4(c).

### iv. ECOA Prohibits Racial Discrimination In The Extension of Credit

Having rejected each of Plaintiff's arguments that PFFCU's Adverse Action Notices and decision not to conduct an appraisal of the Grays Ferry Ave. property violated the ECOA, the Court turns to Plaintiff's claim of racial discrimination.[8]

---

[8] The Court sets forth the following reasons for its decision despite Plaintiff's contention that "Plaintiff did NOT use 'racial discrimination' in his Complaint. Paragraphs 1 through 49 of the Complaint do not allege 'racial discrimination.'" Pl.'s Reply in Opp'n 14, ECF No. 26.

The Court does so because on one hand, Plaintiff states that he does not attempt to allege a claim for racial discrimination under the ECOA, but on the other, he implies that his race was a factor in this case. *See, e.g.*, Pl.'s Reply in Opp'n 10 (explaining that "[t]he ECOA makes it unlawful for any creditor to discriminate. Lenders may ask about race, color, religion national origin, sex or marital status, age, etc. however this information is strictly optional for applicant."); Pl.'s Reply in Opp'n 19 (stating that "[i]n addition to being a member of a 'protected class,' Plaintiff lost his finger serving the City of Philadelphia in 2007.").

To ensure that this case is fully considered on the merits, the Court will interpret Plaintiff's Complaint as setting forth a claim of racial discrimination in addition to credit discrimination, which the Court addressed in Section III.A.i, above (rejecting Plaintiff's claims that the adverse action notices or failure to provide an appraisal evidence any credit discrimination in violation of the ECOA).

The ECOA prohibits "any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction[,] . . . on the basis of race, color, religion, national origin, sex or marital status, or age." 15 U.S.C. § 1691(a). The effectuating regulations under the ECOA likewise provide that "[a] creditor shall not discriminate against an applicant on a prohibited basis regarding any aspect of a credit transaction." 12 C.F.R. § 1002.4.

### 1. Prima Facie Case Of Discrimination Under The ECOA

Absent direct evidence of discrimination, Plaintiffs asserting a claim of discrimination under the ECOA must establish a four-pronged prima facie case, borrowed from the burden-shifting framework under *McDonnell Douglas*, which applies in Civil Rights Act cases. *See, e.g.*, *Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 268 n.5 (3d Cir. 2010) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)); *Chiang v. Veneman*, 385 F.3d 256, 259 (3d Cir. 2004), *abrogated on other grounds by In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305 (3d Cir. 2008)). Under the ECOA, a plaintiff must, at the outset, show that:

(1) plaintiff was a member of a protected class;
(2) plaintiff applied for credit from defendants;
(3) plaintiff was qualified for the credit; and
(4) despite qualification, plaintiff was denied credit.

*Chiang*, 385 F.3d at 259. If the plaintiff can establish a prima facie case, the burden shifts to the defendant to offer evidence of a legitimate, nondiscriminatory reason for the decision to deny the plaintiff's credit application. *Wachovia Mortg. Corp.*, 621 F.3d at 268 n.5. If the defendant offers evidence of legitimate, nondiscriminatory reasons, then the burden shifts back to the plaintiff who may present evidence of pretext. *Id.* at 277 (discussing the burden-shifting framework in analogous civil rights cases under 42 U.S.C. § 1981).

### 2. There Is Insufficient Evidence On Which To Conclude That Plaintiff Was Qualified For Either Home Equity Loan

Applied to this case, the evidence establishes only the first two prongs of the prima facie case: that Plaintiff (1) is a member of a protected class as an African-American man and (2) applied for two home equity loans from PFFCU. There is insufficient evidence, however, even when drawing all inferences therefrom in a light most favorable to Plaintiff, to show that plaintiff was qualified for credit and despite his qualification PFFCU denied him credit.

The inquiry into "whether a plaintiff is 'qualified' for a loan under the third prong should focus on the general form of credit and qualifications for such credit rather than on every possible condition that might need to be fulfilled to proceed to closing . . . . the qualifications should encompass minimum requirements." *Wachovia Mortg. Corp.*, 621 F.3d at 273 n.11. The evidence submitted by both Parties shows that Plaintiff was not qualified for the credit he sought, and that there is no basis to infer that PFFCU's decision to deny Plaintiff's application was based on Plaintiff's race.

As set forth in the Adverse Action Notices, PFFCU denied Plaintiff's applications because he had a limited credit history and the length of time his accounts had been established. Evidence submitted by both Plaintiff and PFFCU shows that PFFCU's reasons for denying credit were supported. In processing Plaintiff's application, PFFCU underwriters discovered that by the time of Plaintiff's application, Plaintiff had only "four trade lines on [Plaintiff's] credit report." Greco Decl. ¶ 7, ECF No. 23-2. Two of the four trade lines had an "active combined maximum credit limit of $2,300, and [Plaintiff] had used approximately 97% of that credit." Greco Decl. ¶ 7. One of these two trade lines had "recently been 30 days delinquent." Greco Decl. ¶ 7. The other two trade lines had been closed for years before Plaintiff's application to PFFCU—one having been closed five years earlier, and the other having been closed ten years

earlier.  Greco Decl. ¶ 7.  Finally, as of the time of Plaintiff's applications, Plaintiff's Experian

credit score was a 619 out of 950.  Compl. Exs. D-1 and D-2, ECF No. 3.

Plaintiff does not contest this evidence except to argue that the Court should not consider

the Greco Declaration because Kevin Greco did not have "personal knowledge" of the matters at

issue in this case.  Pl.'s Reply in Opp'n, ECF No. 26.  Plaintiff bases this argument on the

erroneous belief that "personal knowledge" means "personal involvement."  By contrast, Federal

Rule of Civil Procedure 56(c)(4) permits a Court to consider affidavits or declarations when

made upon personal knowledge and where the testimony would be admissible in evidence at

trial.  Fed. R. Civ. P. 56(c)(4).  Here, Kevin Greco has sworn under oath that he is the

"Consumer Loan Underwriting Manager at" PFFCU and he bases his affidavit on "personal

knowledge, the source of which is my professional responsibilities and duties as a PFFCU

employee."  Greco Decl. ¶ 1, ECF No. 23-2.  The Court may properly consider and rely upon the

Greco Declaration in reaching its decision.[9]

Other than arguing that the Greco Declaration should be disregarded entirely, Plaintiff

has not offered any evidence to refute the matters contained in the affidavit regarding Plaintiff's

credit history and length of time his accounts were established.  Plaintiff has, however, submitted

other evidence in an unavailing attempt to establish that he was qualified for the two home equity

---

[9] Plaintiff makes one other argument to undermine the Greco Declaration: Plaintiff argues that
"[t]he Greco Declaration said 'He was denied credit because there were only four tradelines on
Plaintiff's credit report' . . .  but this statement is missing from the adverse action notices."  Pl.'s
Reply in Opp'n 13, ECF No. 26.  This argument, however, relates to Plaintiff's erroneous belief
that the ECOA regulations require that an adverse action notice must provide an exhaustive list
of exacting reasons for a creditor's decision to deny credit to an applicant.  What ECOA
regulations require is a "statement of specific reasons for the [adverse] action taken," which as
the Court explained in Section III.A.i, above, is not a list of all reasons, but only a creditor's
principal reasons.  That PFFCU did not include detailed reasons regarding Plaintiff's "four
tradelines on Plaintiff's credit report," is not, standing alone, a violation of the ECOA.

loans for he submitted applications. Plaintiff's evidence includes several credit score reports from "*before and after*" his application to PFFCU on November 2015. Pl.'s Reply in Opp'n 2, ECF No. 26; s*ee, e.g.*, Pl.'s Reply in Opp'n Exs. 6 (Plaintiff's TransUnion FICO credit score report dated October 22, 2012), 6B (Plaintiff's Experian credit score report dated June 26, 2017), 18 (Plaintiff's TransUnion FICO credit score report dated June 26, 2017), and 19 (Plaintiff's Equifax FICO credit score report dated June 26, 2017). These credit score reports are on one hand entirely unhelpful because they predate and postdate the events at issue in this case; on the other hand, undermine Plaintiff's arguments because these reports simply corroborate the Greco Declaration.

Plaintiff's Exhibit 6 to the Reply Brief shows that on October 22, 2012, more than three years before Plaintiff's November 2015 applications to PFFCU, Plaintiff's TransUnion FICO credit score was "689." Pl.'s Reply in Opp'n Ex. 6, ECF No. 26. While Plaintiff argues that this exhibit supports the proposition that he had a high credit score at the time of his PFFCU applications, in fact, the TransUnion FICO report simply corroborates what PFFCU had discovered in their underwriting process—that Plaintiff's "Payment history [was] Not Good," and the "Amount of [Plaintiff's] debt [was] Bad." Pl.'s Reply in Opp'n Ex. 6. The TransUnion FICO credit score report also shows, contrary to Plaintiff's assertions, that between October 2012 and November 2015—when he applied for the home equity loans at PFFCU—that Plaintiff's credit score had dropped. *Compare* Pl.'s Reply in Opp'n Ex. 6 (showing Plaintiff's TransUnion FICO credit score in 2012 was 689) *with* Compl. Ex. D-1, ECF No. 3 (showing Plaintiff's Experian credit score in 2015 was 619).

Similarly, Plaintiff's Exhibits 15, 16, and 17 to the Reply Brief also undermine Plaintiff's contention that he was qualified for credit. Exhibits 15, 16, and 17 purportedly show statistical

information about the average Philadelphia resident's credit score and the average national credit score. Plaintiff reasons that by comparing his credit score to these statistical averages he was qualified for credit in November 2015. However, Plaintiff's credit score in November 2015 was lower than the averages shown in each of these exhibits.

Setting aside the fact that the Court cannot determine whether Exhibits 15, 16, and 17 contain statistical information relevant to November 2015, the month and year in which Plaintiff applied for credit from PFFCU,[10] even if the Court assumed the relevance of these documents, the statistical information shows that Plaintiff's November 2015 Experian credit score was much lower than average. *Compare* Compl. Ex. D-1, ECF No. 3 (showing Plaintiff's Experian credit score to be 619) *with* Pl.'s Reply in Opp'n Ex. 15, ECF No. 26 (showing that the average Philadelphian's "VantageScore" credit score was 675—56 points higher than Plaintiff's score) *with* Pl.'s Reply in Opp'n Ex. 16 (showing that the average Philadelphian's Experian credit score was 636—17 points higher than Plaintiff's score) *with* Pl.'s Reply in Opp'n Ex. 17 (showing that the average thirty-five to forty-nine year old Philadelphian's credit score was 655—36 points higher than Plaintiff's score).

---

[10] On Exhibit 15, at the top of the page, Plaintiff circled, by hand, the number "2015" contained in the web address of the website he visited. The Court will assume, for purposes of this opinion that Plaintiff did so to show that the data contained in Exhibit 15 pertains to the year 2015 and, therefore, is relevant to the period at issue in this case.

Exhibit 16 is not dated at all. Still, the Court will assume, for purposes of this opinion, that Exhibit 16 contains information pertinent to the period at issue in this case.

Finally, Exhibit 17 represents, on its face, that it is "Experian <u>2016</u> State of Credit," and, thus, the data is not relevant to the present case. However, assuming that the information is relevant to the period at issue here, Exhibit 17 provides no support to Plaintiff's argument as explained above.

The remaining credit score reports attached to Plaintiff's Reply Brief offer no support to the proposition that Plaintiff's credit score was high or that he qualified for credit from PFFCU because each credit score report <u>postdated</u> the events in this case by <u>over a year-and-a-half</u>. *See* Pl.'s Reply in Opp'n Exs. 6B (Experian score report dated June, 26, 2017), 18 (Plaintiff's TransUnion FICO credit score report dated June 26, 2017), and 19 (Plaintiff's Equifax FICO credit score report dated June 26, 2017).

The Court, thus, concludes given this record, that Plaintiff cannot establish a prima facie case of racial discrimination under the ECOA.

**B.    FHA Claim**

Next, Plaintiff contends that PFFCU violated the FHA by discriminating against him based on his "finger impairment," specifically, his "disabled left pinky finger." Compl. ¶¶ 35, 62, ECF No. 3.  As the prima facie case under the FHA tracks the prima facie case under the ECOA, the Court similarly concludes that Plaintiff has not established a prima facie case of disability discrimination under the FHA.

The FHA provides:

> It shall be unlawful for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of <u>race</u>, color, religion, sex, <u>handicap</u>, familial status, or national origin.

42 U.S.C.A. § 3605 (emphasis added).  "To establish *a prima facie* case of discrimination under the FHA, a plaintiff must allege that: (1) she is a member of a protected class; (2) she attempted to engage in a 'real estate-related transaction' with the defendants; (3) the defendants refused to engage in the transaction despite the plaintiff's qualifications; and (4) the defendants continued to engage in that type of transaction with other parties outside of the plaintiff's class with similar

qualifications." *Stefanowicz v. SunTrust Mortg.*, No. 3:16-CV-00368, 2017 WL 1103183, at *8 (M.D. Pa. Jan. 9, 2017) (citing *Molina v. Aurora Loan Servs., LLC*, 635 F. App'x 618, 625 (11th Cir. 2015).

Even as early as the pleadings stage, a plaintiff must "'provide enough factual matter (taken as true) to suggest <u>intentional discrimination</u>.'" *Id.* (quoting *Molina*, 635 F. App'x at 625) (emphasis added). A plaintiff must present evidence to show intentional discrimination and may not rely on a subjective belief that a defendant discriminated against him because of his disability. *Id.* (collecting cases standing for the proposition that a subjective belief is insufficient to maintain a suit for discrimination under the FHA); *see, e.g.*, *Shahin v. PNC Bank*, 625 F. App'x. 68, 70–71 (3d Cir. 2015); *Wolf v. Bank of Am., N.A.*, Case No. 4:13CV212, 2014 WL 12633677, at *6 (E.D. Tex. Sept. 30, 2014).

Here, just as the Court concluded that Plaintiff failed to establish the third prong of the prima facie case of discrimination under the ECOA, so too does the Court conclude that Plaintiff failed to establish the third prong of the prima facie case of discrimination under the FHA.[11]

The Court further concludes that Plaintiff has not provided any evidence of PFFCU intentionally discriminating against Plaintiff because of his disabled left pinky finger. Plaintiff's Complaint is devoid of any allegation that PFFCU was aware of Plaintiff's disabled left pinky finger. *See generally* Compl., ECF No. 3. Plaintiff attempts to avoid his pleading deficiency by alleging in his Reply Brief that "Plaintiff lost his finger serving the City of Philadelphia in 2007 and told this story to the bank representative." Pl.'s Reply in Opp'n 19, ECF No. 26. Even if the Court assumed that Plaintiff's new allegation is true, an allegation that Plaintiff failed to raise at

---

[11] Please refer to Section III.A.iv.2 for a detailed discussion of the reasons why there is insufficient evidence to show that Plaintiff was qualified for the home equity loans he sought.

any time before responding to the present motion for summary judgment, that PFFCU was aware of Plaintiff's disabled left pinky does not, without more, provide a basis on which to conclude that Plaintiff's loan applications were denied because of his disability.

## C.     Dodd-Frank Act Claim

Plaintiff's final claim is that PFFCU violated the "Mortgage Reform section of the Dodd-Frank Wall Street Reform Act." Compl. ¶ 63, ECF No. 3. Plaintiff provides no citation to the provisions of the Dodd-Frank Act that he alleges to have been violated. However, Plaintiff refers to "the ability to repay rule," which is a concept arising from the Truth in Lending Act and the CFPB's implementing regulations under Regulation Z. Regulation Z, published under Title 12 of the Code of Federal Regulations part 1026, implements the Truth in Lending Act ("TILA") as well as §§ 1411, 1412, and 1414 of the Dodd-Frank Act. The purpose of TILA and the pertinent provisions of the Dodd-Frank Act, is to "strengthen[] . . . the informed use of credit . . . . [and] to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit." 15 U.S.C.A. § 1601(a). In lay terms, the U.S. Department of the Treasury, Office of the Comptroller of the Currency has explained that "[t]he Truth in Lending Act . . . requires lenders to provide you with loan cost information so that you can comparison shop for certain types of loans." *Truth in Lending*, OFFICE OF THE COMPTROLLER OF THE CURRENCY, U.S. DEPARTMENT OF THE TREASURY, https://www.occ.treas.gov/topics/consumer-protection/truth-in-lending/index-truth-in-lending.html (last visited May 17, 2019). What TILA does not do is "tell banks how much interest they may charge or whether they must grant a consumer loan." *Id.*

Regarding the "ability to repay" rule TILA provides that:

> In accordance with regulations prescribed by the Bureau, no creditor
> may make a residential mortgage loan unless the creditor makes a

> reasonable and good faith determination based on verified and
> documented information that, at the time the loan is consummated,
> the consumer has a reasonable ability to repay the loan.

15 U.S.C.A. § 1639c(a)(1).  The statute further creates "a [p]resumption of ability to repay" such

that "[a]ny creditor with respect to any residential mortgage loan . . . may presume that the loan

has met the requirements of subsection (a), if the loan is a qualified mortgage."  15 U.S.C.A. §

1639c(b)(1).  Ultimately, the purpose of this rule is to "protect[] consumers from unaffordable

loans."  48 Fed. Reg. 6415 (Jan. 30, 2013).

      Here, assuming that the home equity loans that Plaintiff applied for would meet the

definition of a qualified "residential mortgage loan" under TILA, the "ability to repay" rule does

not apply because PFFCU did not provide Plaintiff with a loan.  Further, and again, assuming

that the home equity loans are qualified "residential mortgage loans" under TILA, Plaintiff has

not presented sufficient evidence to rebut the presumption of compliance with the ability to repay

rule.  Thus, the Court finds no evidence that a violation of TILA or the corresponding provisions

of the Dodd-Frank Act has occurred on these facts.

## IV.    CONCLUSION

      For the foregoing reasons, Defendant's Motion for Summary Judgement (ECF No. 23 is

GRANTED.  An appropriate Order follows.